# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

**PATRICIA DRIVER o/b/o J.D.M.,** )

    **PLAINTIFF,** )

**VS.** )      **7:08-cv-241-JHH**

**MICHAEL J. ASTRUE,** )
**COMMISSIONER OF**
**SOCIAL SECURITY,** )

    **DEFENDANT.** )

## MEMORANDUM OF DECISION

Plaintiff Patricia Driver, on behalf of her minor son, J.D.M. (claimant), brings this action pursuant to Section 1631(c) of the Social Security Act, 42 U.S.C. § 1383(c), which incorporates Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking review of the decision of the Commissioner of Social Security (Commissioner) denying her application for child Supplemental Security Income (child SSI) benefits under Title XVI of the Social Security Act.  For the reasons set forth below, the decision is due to be remanded.

### I.  PROCEDURAL HISTORY

Plaintiff protectively filed an application for child SSI on March 4, 2004, alleging a disability onset date of March 1, 2001.  (Tr. 12, 53-60.)  The application

was denied, (tr. 30-32), and plaintiff then requested and received a hearing before an Administrative Law Judge (ALJ).  (Tr. 268-306.)  The hearing was held on July 21, 2006 in Tuscaloosa, Alabama.  (Tr. 268.)  In his December 22, 2006 decision, the ALJ determined that plaintiff was not disabled within the meaning of the Social Security Act and thus ineligible for child SSI benefits.  (Tr. 12-22.)  After the Appeals Council denied plaintiff's request for review of the decision of the ALJ, (Tr. 3-5), that decision became the final decision of the Commissioner, and therefore a proper subject of this court's review.

## II. STANDARD OF REVIEW

The only issues before this court are whether the record reveals substantial evidence to sustain the decision of the ALJ, see 42 U.S.C. § 405(g); Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the correct legal standards were applied.  Lamb v. Bowen, 847 F.2d 698, 701 (11th Cir. 1988); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  Sections 405(g) and 1383(c) mandate that the Commissioner's findings are conclusive if supported by "substantial evidence."  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported

by substantial evidence.  See id. (citing Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence.  Dyer, 395 F.3d at 1210 (citing Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)).  "It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Martin, 894 F.2d at 1529 (quoting Bloodsworth, 703 F.2d at 1239) (other citations omitted).  If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. Phillips v. Barnhart,  357 F.3d 1232, 1240 n.8 (11th Cir. 2004).  While the court acknowledges that judicial review of the findings of the ALJ is limited in scope, the court also notes that review "does not yield automatic affirmance.."  Lamb, 847 F.2d at 701.

### III.  ADMINISTRATIVE RECORD

The claimant was sixteen (16) years old at the time of the decision, (tr. 25), and at the time of the hearing was preparing to enter the ninth grade.  (Tr. 277.) He had many problems in school and was suspended numerous times in the fourth, fifth and sixth grades due to fighting, bad attitude and dress code violations.  (Tr. 212.)  He has also repeated at least two grade in school.  (Tr. 212, 276-78.)

Although neither party gives a detailed description of the record in their briefs, the court goes through this exercise because doing so reveals the clear gaps in the record. The first part of the court's recitation tracks the documents the ALJ had when he made the decision. The second part recites much of the hearing testimony.

### A. Documents in the Record

In September of 2002, the claimant was diagnosed with Oppositional Defiant Disorder (ODD) and with a Global Assessment of Functioning of 50 by Dr. Timothy Baltz of the Indian Rivers Mental Health Center. (Tr. 196.) The claimant began counseling and therapy at Indian Rivers at that time, and presented to sessions each week with similar problems: suspensions for fighting, defiance, disrespectful behavior, and disobedience. (Tr. 191-97.)

On March 6, 2003, the claimant saw Dr. Alwyn Whitehead, Jr., Psy.D., for a claims-related consultative evaluation. (Tr. 211.) The claimant was twelve (12) years old at the time of the evaluation. (Id.) Claimant was cooperative during the examination, although Dr. Whitehead noted that he responded only when asked specific questions. (Tr. 213-14.) Dr. Whitehead concluded that the claimant "appears to have a life long history of mental slowness" and "some minor cognitive impairments." (Tr. 214.) Although the claimant did not have a

restriction of activities or constriction of interests, Dr. Whitehead noted "a history of difficulty relating to peers and adults in an appropriate manner" and "behavioral problems at home." (Id.) Dr. Whitehead concluded that the claimant "evidenced impairments in his social and adaptive functioning" with "difficultly responding in an age appropriate manner, cognitively, communicatively, socially, adaptively, behaviorally, and in concentration, persistence and pace." (Id.)

Throughout the spring, summer and fall of 2003, the claimant remained in counseling at Indian Hills. (Tr. 236-42.) He continued to have problems at home and at school during this time, including a suspension for an incident on the bus. (Id.) The claimant was failing many subjects in school, but admitted to not doing his schoolwork. (Id.) The claimant routinely reported staying up late at night and being sleepy or falling asleep in school. (Id.) He was also acting out at home, including stabbing his older brother with a plastic fork, "going after" his brother with a razor blade, and generally behaving in a threatening manner. (Id.)

On November 24, 2003, the claimant was seen for a psychiatric examination by Dr. Timothy Baltz at Indian Rivers. (Tr. 234-35.) Dr. Baltz diagnosed the claimant with Disputive Behavior Disorder, NOS. (Tr. 235.) He prescribed Fluoxetine and because the claimant stated that he would not take any medication, Dr. Baltz prescribed the drug as a liquid to be placed in the claimant's food. (Id.)

The claimant continued counseling at Indian Rivers for the first three months of 2004.[1]  (Tr. 231-33.)  Reports from those counseling sessions revealed much of the same troubled behavior, with only a small amount of improvement since beginning his medication.  (Id.)  During this time, the claimant was suspended from school on multiple occasions for skipping school and behavioral problems, including hitting another student.  (Id.)  He also had an altercation at home with his stepfather during which the claimant pushed his stepfather through a wall and then destroyed the wall.  (Id.)

In March 2004, the claimant's school referred him to a juvenile probation officer, and he had a hearing in court on April 13, 2004.[2]  (Tr. 231.)  The day after the claimant's first meeting with his parole officer, the claimant again was suspended from school for fighting.  (Id.)  Notes from Indian Rivers indicate that the claimant did not want to be sent to a DYS program, but that he did not recognize the seriousness of any of his behavioral problems or the potential for more serious consequences should his behavior continue.  (Id.)

On May 24, 2004, the claimant was examined by Jaana Niinikoski, Ph.D.

---

[1] The last notes from Indian Rivers bear the date March 7, 2004.  (Tr. 231.)

[2] There are no documents in the record regarding the assignment of a juvenile probation officer or the claimant's court appearance.

for a claims-related consultative psychological evaluation. (Tr. 248-50.) At the time of the evaluation, the claimant was thirteen (13) years old. (Tr. 248.) Dr. Niinikoski concluded that the claimant's functioning appeared to be roughly at age-level, but noted that no psychometric testing was performed. (Tr. 250.) Although he appeared to have basic academic skills, Dr. Niinikoski could not determine, based on the brief screening, whether the claimant performed at his age and grade level. (Id.) Dr. Niinikoski's impressions included ODD and academic problems, with a GAF of 55. (Id.) Dr. Niinikoski suggested that the claimant's cognitive abilities and level of current academic performance be examined further because potential learning disabilities could not be ruled out. (Id.) She recommended that the claimant should continue counseling and medication, and that the claimant's mother should be helped with her parenting skills. (Id.) This evaluation is the last piece of medical evidence in the record, although well over two years had expired between the date of the evaluation and the date of the decision.

*B.  Administrative Hearing Testimony*

At the July 21, 2006 hearing, the claimant was fifteen (15) years old and testified first. (Tr. 276-77.) He stated that he made poor grades and that he had to

repeat the sixth and eighth grades.[3] (Id.) The claimant said that all of his grades were poor, not just certain subjects, and that he does not care about school. (Tr. 278.)

The claimant's mother next testified, outside of the presence of the claimant. (Tr. 280.) The ALJ focused his questions on the six areas of potential functional limitations, or six domains of functioning, and asked her whether she believed the claimant suffered from a "severe functional limitation" in each area.[4] (Tr. 281-83.) The ALJ began with the last area and asked if the claimant was "sick all the time either due to physical or mental things." (Tr. 283.) She responded that the claimant complains of headaches each day, which began in early 2005. (Tr. 283-85.) The headaches respond to aspirin or Tylenol. (Tr. 284.)

With regard to domains number four and five, the claimant's mother testified that he is able to care for himself, (tr. 285), and that he did not have any problems in his ability to move around and manipulate objection. (Tr. 286.) However, when it came to the third domain, the claimant's ability to interact and

---

[3] Later in the hearing, the claimant stated that he flunked the seventh and ninth grades. (tr. 277-78.)

[4] Although the ALJ explained to the claimant's mother the purpose of these questions, her responses leave doubt as to whether she fully understood the line of questioning.

relate with others, the claimant's mother and grandmother[5] noted the most problems. (Id.) The grandmother testified that the claimant is rebellious and does not behave. (Tr. 286-87.) She stated that he is "hot tempered" and that he throws things and slams things down, even over the smallest issues. (Tr. 287.) She stated that this inappropriate behavior began when he was a child, when things did not go his way, and has continued to the present. (Tr. 288.)

The ALJ then moved on to the second domain, or the claimant's ability to complete a task. (Id.) The claimant's mother testified that he would be able to follow simple instructions, such as separating balls from blocks. (Id.) As to the first domain, his ability to acquire and use information, the claimant's mother stated that if someone merely read instructions to the claimant, he would not be able to "comprehend it right off." (Id.)

After the ALJ summarized his views of the testimony regarding the six domains, the claimant's mother interjected that "he has been sent off like five times" to a boy's home. (Tr. 289-90.) When the ALJ questioned the claimant's mother regarding this comment, the following, somewhat confusing exchange occurred:

---

[5] Throughout the questioning of the claimant's mother, the claimant's grandmother would occasionally concur or respond to the questions of the ALJ because the claimant lived with his grandmother much of the time. (See tr. 286.)

Q: And when you say he's been sent off, who's sending off?
A: He's on probation. He have a probation officer he have to meet with every month.
Q: He's engaged in criminal conduct? Has he been arrested?
A: He been misbehaving at school.
Q: Oh, so it's, it's the school officials who – what? They sent him – they suspended him from school?
A: Many times.
Q: And so when you say he's been sent off you're talking about suspensions from school?
A: And sent to boy's homes.
Q: Oh, when was he sent off to a boy's home?
A: I can [sic] remember.
Q: What year? You said five times?
A: Yes.
Q: What years? When was the first year? What year?
A: The end of 2004?
Q: The end of 2004?
A: I think it was.
Q: So it would be five times since the end of 2004?
A: He got – first got started sent – they first sent him off in 2004. I think it was in October, I think. And he, he just got back from a drug rehab I think in –
Q: He's doing drugs?
A: He just got back from there in I think – was it April? And that was the last time.
Q: How, how long was he in drug rehab?
A: I think two months.
    . . .
Q: What did he do? Did he get arrested? Did he get busted at school or arrested by a local police or how did he get – why is it he went to – or did he go to rehab voluntarily?
A: Oh, he was on the school bus, and I think some boy was smoking, smoking, because he, he wasn't even in regular school he had got in so much trouble. In regular school they put him in alternative school so they wouldn't expel him from school, and I think a probation office had came up to the school and drug tested him, and he tested

positive for marijuana, and they sent him off.

(Tr. 296-98.)

At this point in the hearing, there was clear confusion regarding the probation officer.  The ALJ continued to ask the claimant's mother whether it was an actual probation officer because the claimant was convicted of a crime, or whether it was some sort of school official.  (Tr. 298-99.)  After some time, the claimant's mother revealed that there was an incident at a school football game where the claimant "got into or something" with a "little boy" and the little boy said that the claimant said that "he had a gun."  (Tr. 299.)  After this incident, the claimant apparently "went to court and everything" and, according to his mother "they was going to send him off, but he had a lawyer, and they just tell him if you plead guilty to this, you won't get as long, you know, when you go off."  (Id.)

Additionally, the claimant's mother testified that he was recently suspended from school for "nudity, exposure or something.  They said he was – he used the bathroom in front of teachers or something."  (Tr. 300.)

The claimant's mother then asked whether she needed to submit information from the five times the claimant was sent to a boy's home.  (Tr. 304-05.)  The ALJ said that the information was relevant and that he would leave the record open for 30 days to give her time to send any documentation about the boy's home. (Tr.

11

305.) The claimant's mother also informed the ALJ that the claimant stopped attending counseling sessions at Indian Rivers. (Tr. 304.) The ALJ finally told the claimant's mother to send him any school records she wanted him to consider, including records of his suspensions because that was "relevant" information. (Tr. 305.) He reiterated that she only had 30 days to submit any additional records, and that if he did not receive anything else, the ALJ would make a decision without it. (<u>Id.</u>)

There are no documents in the record regarding the claimant's removals from school or his placement in the detention centers. There are also no documents in the record regarding any discipline at school, including any school suspensions. There are also no documents in the record regarding his guilty plea or the incident surrounding it.

There was a request for information sent to the Juvenile Court of Bibb County in Centreville, Alabama regarding the claimant. (Tr. 259.) The request asked for any "medical evidence of record" regarding the claimant. (<u>Id.</u>) Stewart Dellinger, a probation officer, responded to the inquiry and stated that after a review of the claimant's file, there was no "medical information in the child's social records which [Dellinger] fe[lt] would be helpful in determining disability." (Tr. 264.)

12

## IV.  THE DECISION OF THE ALJ

In determining whether a child is disabled, the ALJ employs a three-step sequential evaluation process.  The ALJ must consider the following: (1) whether the child is working; (2) whether the child has a medically determinable "severe" impairment or combination of impairments; and (3) whether the child's impairment or combination of impairments meets, medically equals, or functionally equals the severity of an impairment in the Listing of Impairments, found at 20 C.F.R. pt. 404, subpt. P, app. 1 (2007).  20 C.F.R. § 416.924.  In step three, the ALJ initially evaluates the evidence of record and determines whether the child's severe impairment or combination of impairments meet or medically equal a listed impairment.  Id.  If they do not, the ALJ must decide whether the impairment or combination of impairments "functionally equals" the severity of any listed impairment.  Id.  Functional equivalence is dependent on the child's impairments or combination of impairments resulting in marked limitations in two broad categories of functioning or extreme limitation in one broad category of functioning.  20 C.F.R. § 416.926a(a).  These broad categories, called domains, are as follows:

> (1) Acquiring and using information;
> (2) Attending and completing tasks;
> (3) Interacting and relating with others;

>    (4) Moving about and manipulating objects;
>    (5) Caring for yourself; and
>    (6) Health and physical well being.

20 C.F.R. § 416.926a(b)(1)(i-vi) (2007).  An impairment is "marked" when it interferes seriously with the ability to independently initiate, sustain, or complete activities.  See 20 C.F.R. § 416.926a(e)(2)(i). An impairment is "extreme" when it interferes very seriously with the ability to independently initiate, sustain, or complete activities. See 20 C.F.R. § 416.926a(e)(3)(i).

    Here, the ALJ found that the claimant had not engaged in substantial gainful activity since the alleged onset date of disability.  (Tr. 13, 21.)  The ALJ proceeded to the second step and found that the claimant has the severe medically determinable impairment of ODD.  (Tr. 18, 21.)  Finally, at the third step of the sequential evaluation process, the ALJ found that the claimant's impairment did not meet or medically equal the criteria for any of the Listings. (Tr. 18.) Having determined that the claimant's impairments did not meet or medically equal any of the Listings, the ALJ continued to determine whether his impairment, ODD, was functionally equal to any of the Listings.  The ALJ examined the six (6) functional domains and found that the claimant had a "less than marked" limitation in the domains of acquiring and using information, interacting and relating with others, and health and physical well-being. (Tr. 19-21.) In the remaining domains of

attending and completing tasks, moving about and manipulating objects, and caring for self, the ALJ found that the claimant did not contend that he has either a marked or extreme limitation of functioning in these domains, and thus, the ALJ found no marked or extreme limitation. (Tr. 19-21, 289.) Therefore, because the claimant did not have one "extreme" limitation or two "marked" limitations in the six functional domains, the ALJ found that he does not functionally equal any of the Listings. (Tr. 22.) As such, the ALJ concluded that the claimant was not disabled. (Id.)

## V. PLAINTIFF'S ARGUMENT FOR REMAND OR REVERSAL

The plaintiff seeks to have the ALJ's decision, which became the final decision of the Commissioner following the denial of review by the Appeals Council, reversed, or in the alternative, remanded for further consideration. Plaintiff makes two arguments to the court. First, plaintiff contends that the ALJ did not properly develop the record. (Doc. # 7 at 6-9.) Second, plaintiff argues that the finding of the ALJ that the claimant had a "less than marked" limitation in the domain of interacting and relating with others (social functioning) is not supported by substantial evidence. (Id. at 9-12.) The court need not address the second argument, however, because the court agrees with plaintiff that the ALJ failed to properly develop the record.

Plaintiff asserts that the ALJ failed to fulfill his duty to develop a full and fair record of the claimant's past mental health treatment records, school records, records from juvenile detention centers and records from the Bibb County Juvenile Court, although the ALJ was on notice regarding all these records.  (Doc. # 7 at 6-9.)  A social security disability claimant has a statutory right, which may be waived, to be represented by counsel at the hearing before the ALJ.  See Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995).  Whether or not a disability claimant is represented, the ALJ has a duty to develop a full and fair record,[6] because the ALJ hearing is not an adversary proceeding.[7]  See id.; Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997).  There must be a showing of prejudice before a reviewing court will find that a disability claimant's right to due process has been violated to such a degree that the case must be remanded for further development of the record.  Brown, 44 F.3d at 934.  The reviewing court should be guided by

---

[6] When the right to representation has not been waived, the ALJ's obligation to develop a full and fair record rises to a special duty, requiring essentially a record showing that the claimant was not prejudiced by lack of counsel.  Brown, 44 F.3d at 934.  However, it is not necessary to determine that the presence of counsel would necessarily have resulted in any specific benefits.  See Graham, 129 F.3d at 1423.

[7] See Sims v. Apfel, 530 U.S. 103, 110 (2000) (noting that the differences between courts and agencies are nowhere more pronounced than in Social Security proceedings, which follow "the investigatory model."  The ALJ's duty is "to investigate the facts and develop the arguments both for and against granting benefits"; the Commissioner has no representative before the ALJ to oppose the claim.).

"whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." Graham, 129 F.3d at 1423.

Here, the plaintiff waived her statutory right to be represented by counsel at the hearing. However, the obvious evidentiary gaps in the record resulted in unfairness to the claimant. The court is simply not convinced of the completeness of the record. For instance, several times throughout the administrative hearing, the ALJ noted that evidence which was not in the record was "relevant," such as records from the five times the claimant was sent to juvenile detention centers and school suspension records. (Tr. 304, 305.) When the ALJ realized that such relevant evidence was not in the record, the ALJ even commented "see that's what I mean about having a lawyer. A lawyer goes out and gets all that stuff." (Tr. 304.)

Additionally, the court cannot help but notice that the record documents end with the evaluation of the claimant in May 2004, when he was thirteen (13) years old. The claimant was fifteen (15) at the time of the hearing and sixteen (16) at the time of the decision. Stated another way, the record is completely silent regarding the most recent two and a half years. The ALJ was well-aware of events that occurred since the last record which were highly relevant to his claim, including alleged repeated suspensions and placement in boy's homes.

17

The only evidence in the record regarding the claimant's treatment are the notes from Indian Rivers Mental Health Center. (Tr. 190-97, 228-47.) These notes began in September 2002, before his first application for SSI, and ended in early March 2004, over two years before the administrative hearing. The claimant's mother informed the ALJ at the hearing that the claimant no longer was treated at Indian Rivers Mental Health Center, (tr. 304), but did not inquire if the claimant was being, or had been, treated anywhere else.

The records also contain two consultative reports, but neither is helpful. The first was done when the claimant was twelve (12) years old and the second when he was thirteen (13). The more recent of the two concludes that the claimant's cognitive abilities and level of current academic performance should be examined further because potential learning disabilities could not be ruled out. Itrecommended that the claimant continue counseling and medication, but the record is silent as to whether the claimant was still on medication or still in therapy. When the claimant's mother testified that he no longer attended Indian Hills, the ALJ did not inquire as to whether he continued counseling somewhere else.

The only school records in the file are two teacher questionnaires - one from elementary school in 2002 and another from a middle school science teacher in

2004. (Tr. 149-60, 198-209.) The school records are woefully incomplete, especially considering the testimony of the claimant's mother at the administrative hearing. There are no documents in the record regarding the claimant's numerous and repeated suspensions. There are also no documents regarding his placement in alternative school, another fact mentioned by his mother during the hearing.

Likewise, the letter and response from the Bibb County probation officer is incomplete. The request by the Disability Determination Services (DDS) asks for "medical information" when this case is clearly one dealing with the claimant's mental and social character. The response from the probation officer is even more telling, which references a file on the claimant, but states that in the probation's officer's opinion, there is no <u>medical</u> information in the file that would help in the disability determination. This response evidences a clear misunderstanding between DDS and the probation officer, one that the ALJ should have recognized instead of merely accepting that the probation officer had nothing relevant to add.

In summary, the ALJ failed to properly develop the record. This failure was prejudicial to the claimant. The ALJ clearly recognized the materiality of the missing information, yet he made a disability determination without this information. The lack of documentation is prejudicial because it creates an evidentiary gap -- there is simply no way of knowing whether the missing

evidence would lend credence to the plaintiff's allegations.  See Brown, 44 F.3d at 936.  As such, the court cannot determine whether substantial evidence supports the disability determination of the ALJ because the ALJ failed to develop the record fully and fairly by obtaining evidence that was material to the claimant's disability claim.

## VI.  CONCLUSION

The final decision of the Commissioner, therefore, is due to be remanded for further consideration, consistent with this opinion.  A separate order will be entered.

**DONE** this the   5th   day of March, 2009.

_____
SENIOR UNITED STATES DISTRICT JUDGE